**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT MYERS DIVISION**
**www.flmb.uscourts.gov**

In re:

Chapter 7
Case No. 2:26-bk-01589-FMR

**Alexandra Fuentes Galleres,**
**aka Alexandra Fuentes**

    Debtor.

_____/

**U.S. BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF BRACKENRIDGE**
**MORTGAGE TRUST'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

**NOTICE OF OPPORTUNITY TO**
**OBJECT AND REQUEST FOR HEARING**

If you object to the relief requested in this paper you must file a response with
the Clerk of Court at Sam M. Gibbons United States Federal Building and
Courthouse, 801 N. Florida Avenue Suite 555, Tampa, Florida 33602 within
21 days from the date of the attached proof of service, plus an additional three days
if this paper was served on any party by U.S. Mail.

If you file and serve a response within the time permitted, the Court will either
notify you of a hearing date or the Court will consider the response and grant
or deny the relief requested in this paper without a hearing. If you do not file a
response within the time permitted, the Court will consider that you do not
oppose the relief requested in the paper, and the Court may grant or deny the
relief requested without further notice or hearing.

You should read these papers carefully and discuss them with your attorney if
you have one. If the paper is an objection to your claim in this bankruptcy
case, your claim may be reduced, modified, or eliminated if you do not timely
file and serve a response.

U.S. Bank Trust National Association, as Trustee of Brackenridge Mortgage Trust ("**Movant**"),

its successor and/or assigns, by its undersigned counsel hereby files this Motion for Relief From the

Automatic Stay, pursuant to Federal Rules of Bankruptcy Procedure 4001 and 9014 to lift the automatic

stay imposed by 11 U.S.C. § 362 (a) for cause under 11 U.S.C. § 362 (d), to exercise its non-

bankruptcy rights with respect to certain real property mortgaged to Movant. In support thereof, the Movant states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

2.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## SUMMARY OF THE RELIEF SOUGHT

By this Motion, Movant seeks relief from the automatic stay under 11 U.S.C. § 362(a) pursuant to: (i) 11 U.S.C. § 362(d)(1), because "cause" exists as a result of Movant not receiving adequate protection for its secured interest in the real property located at *14838 Loggerhead Dr., Naples, FL 34120* ("**Property**") securing the obligations due and owing to Movant; or, alternatively, (ii) 11 U.S.C. § 362(d)(2), because the Debtor has little to no equity in the Property and, (ii) the Property is not necessary for an effective reorganization.

## PROCEDURAL BACKGROUND

**A.      The Bankruptcy Filing.**

3.      On June 26, 2026, Alexandra Fuentes Galleres ("**Debtor**"), filed a Voluntary Petition for relief pursuant to Chapter 7 of the United States Bankruptcy Code [D.E. 1].

**B.      The secured interests and amounts due on the Property.**

4.      On July 15, 2021, the Debtor executed and delivered a Note to lender Security National Mortgage Company in the original principal amount of Five Hundred Nineteen Thousand Eight Hundred Forty dollars and zero cents 00/100 ($519,840.00) ("**Note**") for the purchase of the Property.

The amount owed to Movant is secured by that certain mortgage of even date, recorded on July 22, 2021 as Doc # 6099623, in the Public Records of Collier County, Florida, encumbering the Property as described in the mortgage then owned by and in possession of the Debtor ("**Mortgage**").

5.      Movant is the holder of the Note and the Mortgage by virtue of those Allonges to Note and Assignment(s) of Mortgage attached to the Note and Mortgage. The Note, Mortgage, Allonges to Note and Assignment(s) of Mortgage constitute the Loan Documents (collectively, the "**Loan Documents**"). A true and correct copy of the Loan Documents are attached to this Motion as **Composite Exhibit "A, B, and C"**.

6.      The Debtor is the owner of and/or holds an interest in the Property.

7.      The Property is legally described as follows:

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF COLLIER, STATE OF FLORIDA, AND IS DESCRIBED AS FOLLOWS:

LOT 97 OF THE PLAT OF ABACO POINTE, RECORDED IN PLAT BOOK 66, PAGE 61-64 IN THE PUBLIC RECORDS OF COLLIER COUNTY, FLORIDA

8.      The Debtor has committed an Event(s) of Default for failure to pay the monthly post-petition payment due under the terms of the Note for July 1, 2026, and all subsequent monthly payments thereafter.   Furthermore, the Debtor is contractually delinquent and due for the January 1, 2026 contractual payment.

9.      As of June 30, 2026 the projected total payoff good through July 30, 2026 is in the amount of $493,921.06 which does not include the attorney's fees and costs associated with the filing of this instant Motion.

10.     The Property has no equity after accounting for the cost of sale as the estimated total assessed valuation of the Property, as per the Collier County Property Appraiser's Office, is $502,873.00 (the "**Valuation**").  A true and correct copy of the Valuation is attached hereto as **Exhibit "D"**.

11.     The Property may be diminishing and decreasing in value and may continue to do so by virtue of the continued use of the Property by the Debtor and/or unknown parties in interest, without payments to Movant.

12.     Movant is entitled to pursue its non-bankruptcy rights with respect to the Property.

13.     It is universally accepted that "Section 362(d)(1) and 362(d)(2) are disjunctive; the Court *must* lift the stay if the movant prevails under either of the two grounds." *In re Kaplan Breslaw Ash*, 264 B.R. 309, 321 (Bankr. S.D.N.Y. 2001) (emphasis added); see also *In re Albany Partners*, 749 F.2d 670, 673 (11th Cir. 1984) (noting the alternative grounds for stay relief).

14.     In the present case, Movant is entitled to stay relief under § 362(d)(1), since Movant's interest in the Property is not being adequately protected. Additionally, Movant is entitled to relief from the stay under § 362(d)(2) because there is no equity in the Property and the Property is not necessary for an effective reorganization of the Debtor.

15.     Section 362(d)(1) of the Bankruptcy Code provides for lifting of the automatic stay "for cause," and a movant bears the initial burden to demonstrate that "cause exists." 11 U.S.C. § 362(d)(1). As explained by the Bankruptcy Courts, "[u]pon motion to lift or modify the automatic stay, burden of proof is a shifting one, with the movant having the burden of making initial showing of 'cause,' and debtor having the ultimate burden of proof on all issues other than debtor's equity in property." *In re Telegroup, Inc.*, 237 B.R. 87, 91 (Bankr. D.N.J. 1999); *see also* 11 U.S.C. § 362(g).

16.     A debtor's failure to provide adequate protection of a creditor's interest is a classic basis

for granting relief from the stay for cause. See *In re McGaughey*, 24 F.3d 904, 906 (7th Cir. 1994); *see also, e.g., In re Telegroup,* 237 B.R. at 91. A creditor can establish its case quantitatively, i.e., by demonstrating the decline in the value of the creditor's interest in the debtor's property.

17.    In the instant case, Movant is entitled to adequate protection in any form and Movant's collateral continues to depreciate in value due to continued, uncompensated use by the Debtor. Accordingly, absent adequate protection, cause exists to lift the automatic stay so that Movant may exercise its non-bankruptcy rights with respect to the Property.

18.    If the Court lifts the stay that it should also waive the requirement of Bankruptcy Rule 4001(a)(4), therefore allowing an Order to be effective upon this Honorable Court's signature and Movant to pursue its *in rem* remedies without further delay.

**WHEREFORE,** Movant, respectfully requests that this Court enter an Order (i) granting Movant's relief from the automatic stay as to U.S. Bank Trust National Association, as Trustee of Brackenridge Mortgage Trust, so as to allow Movant to enforce its *in rem* remedies against the Property, (ii) waiving the time requirements under Rule 4001(a)(4) of the Federal Rules of Bankruptcy Procedure so that it may commence and/or complete state court foreclosure proceedings, and allow the state court to enter all necessary orders, judgments, and decrees associated therewith, (iii)  binding the Debtor in the event of a conversion; and (iv) together with such other relief that this Honorable Court may deem just and proper.

**Dated:** 7/14/2026

Respectfully Submitted,

**GHIDOTTI | BERGER, LLP**
*Attorneys for Secured Creditor*
10800 Biscayne Blvd., Suite 201
Miami, FL 33161
Telephone: 305.501.2808
Facsimile: 954.780.5578
bknotifications@ghidottiberger.com

By: /s/ Melbalynn Fisher
Melbalynn    Fisher,    Esq.    (FL    Bar    #107698)

*Case No.: 2:26-bk-01589-FMR*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on ___7/14/2026___, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

I also certify that the foregoing document is being served this day, either via transmission of Notice of Electronic Filing generated by CM/ECF or by first class U.S. Mail, upon:

*Debtor*
**Alexandra Fuentes Galleres**
14838 Loggerhead Drive
Naples, FL  34120

*Debtor's Counsel*
**Timothy S Kingcade**
Kincade & Garcia, PA
1370 Coral Way
Miami, FL 33145
305-285-9100
Fax : 305-285-9542
Email: tsk@miamibankruptcy.com

*Trustee*
**Richard M Dauval**
P.O. Box 7929
St. Petersburg, FL 33704
727-327-3328

*U.S. Trustee*
**United States Trustee - TPA7/13, 7**
Timberlake Annex, Suite 1200
501 E Polk Street
Tampa, FL 33602

By: /s/ Melbalynn Fisher
        Melbalynn Fisher, Esq.

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## FT MYERS DIVISION
### www.flmb.uscourts.gov

In re:

Chapter 7

**Alexandra Fuentes Galleres,**
**aka Alexandra Fuentes**

Case No. 2:26-bk-01589-FMR

     Debtor.

_____/

### AFFIDAVIT IN SUPPORT OF U.S. BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF BRACKENRIDGE MORTGAGE TRUST'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

1.     I, Sarah Wasson _____, declare and state as follows:

2.     I am over the age of eighteen years and not a party to this action. The facts set for the below are known to me personally based upon the review of the business records and I have first-hand knowledge of them. If called as a witness, I could and would testify competently under oath to such facts.

3.     I am a Bankruptcy Asset Manager _____ at SN Servicing Corporation ("**Servicer**"), Servicer for U.S. Bank Trust National Association, as Trustee of Brackenridge Mortgage Trust ("**Movant**"), and am familiar with the subject Mortgage and loan in favor of Movant, and the subject Bankruptcy case.

4.     I am familiar with the manner and procedure by which the records of Movant are obtained, prepared, and maintained. Those records are obtained, prepared, and maintained by employees or agents of Movant in the performance of their regular business duties at or near the time, act, conditions, or events recorded thereon. The records are made either by persons with knowledge of

the matters they record or from information obtained by person with such knowledge. It is my business practice to maintain these records in the regular course of business.

5.      Movant has been responsible for the handling of all matters relative to the underlying loan prior to the filing of the within motion, including but not limited to processing of all payments received, crediting of received payments, adding all proper charges to the loan, confirming the maintenance of hazard insurance and property taxes, property preservation where appropriate, communicating with and responding to the borrower on all matters relative to the loan, and the commencement of non-judicial foreclosure proceedings where appropriate. All activities on the loan advanced by Movant were advanced in accordance with the terms of the Note and Mortgage.

6. The subject real property securing the Mortgage loan is commonly known as *14838 Loggerhead Dr., Naples, FL  34120* ("**Property**"), and legally described as set forth therein. A true and correct copy of the Mortgage is attached to the Motion as **Exhibit "A"**.

7.      Movant is the holder and in possession of the original Promissory Note dated July 15, 2021 in the principal amount of $519,840.00 which is secured by the Mortgage of the same date. A true and correct copy of the Note is attached to the Motion as **Exhibit "B"**.

8.      Movant is the current beneficiary of the Mortgage pursuant to a recorded assignment. True and correct copy of the Assignment is attached to the Motion as **Exhibit "C"**.

9.      The Debtor, Alexandra Fuentes Galleres (**Debtor**") filed this bankruptcy petition on June 26, 2026 as a Chapter 7 case.

10.     With respect to Movant's secured claim, as of June 30, 2026, the projected total payoff good through July 30, 2026 was $493,921.06 and the following amounts were due and delinquent:

| | |
|---|---|
| 2 Payments @ $3,397.07 Due 1/1/26-2/1/26 | $6,794.14 |
| 5 Payments @ $3,465.33 Due 3/1/26-7/1/26 | $17,326.65 |
| Late Charges | $1,545.17 |
| Attorney Fees | $2,315.00 |
| NSF Fees | $10.00 |
| **Total Delinquency** | **$27,990.96** |

11.    The next scheduled monthly payment of $3,465.33 is due August 1, 2026, and continuing each month thereafter. However, this amount may be subject to change pursuant to the terms of the applicable loan documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 14, 2026 (Date) Eureka _____ (City), CA  (State)

_____
Signature

_____
Sarah Wasson
Print Name

- 3 -

# EXHIBIT "A"

INSTR 6099623   OR 5985   PG 2066   E-RECORDED 7/22/2021 11:27 AM   PAGES 13
CLERK OF THE CIRCUIT COURT AND COMPTROLLER, COLLIER COUNTY FLORIDA
DOC@.35 $1,819.65   INT@.002 $1,039.68 REC $112.00
OBLD $519,840.00   OBLI $519,840.00

When recorded, return to:
SecurityNational Mortgage Company
Attn: Final Document Department
5300 South 360 West, Suite 150
Murray, UT 84123

This document was prepared by:
Fran Tuckson
SecurityNational Mtg Co
21430 Cedar Dr #200
Sterling, VA 20164
703-880-1844

Title Order No.: FL2115534

██████████████

——————————————————— [Space Above This Line for Recording Data] ———————————————————

## MORTGAGE

████████████████

**MERS PHONE #: 1-888-679-6377**

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
**(A)** "**Security Instrument**" means this document, which is dated **July 15, 2021,**           together with all Riders to this document.
**(B)** "**Borrower**" is   **ALEXANDRA FUENTES GALLERES, AN UNMARRIED WOMAN.**

Borrower is the mortgagor under this Security Instrument.
**(C)** "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** "**Lender**" is   **SecurityNational Mortgage Company.**

Lender is  **a Corporation,**                                            organized and existing
under the laws of  **Utah.**
Lender's address is **5300 South 360 West, Suite 150, Murray, UT 84123**

**(E)** "**Note**" means the promissory note signed by Borrower and dated **July 15, 2021.**          The Note states that Borrower owes Lender  **FIVE HUNDRED NINETEEN THOUSAND EIGHT HUNDRED FORTY AND NO/100** * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * Dollars (U.S. **$519,840.00**          )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 1, 2051.**

FLORIDA – Single Family – Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT** Form 3010 1/01
Ellie Mae, Inc.                                    Page 1 of 10                                    FLEDEED   1120
                                                                                                   FLEDEED (CLS)
                                                                                                   07/14/2021 01:19 PM PST

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider     ☐ Condominium Rider     ☐ Second Home Rider
☐ Balloon Rider     ☒ Planned Unit Development Rider     ☐ V.A. Rider
☐ 1-4 Family Rider     ☐ Biweekly Payment Rider
☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
**County**     of   **Collier**
[Type of Recording Jurisdiction]     [Name of Recording Jurisdiction]:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 21800012125**

which currently has the address of   **14838 Loggerhead Drive, Naples,**

[Street] [City]

Florida   **34120**     ("Property Address"):
[Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security

**FLORIDA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3010 1/01
Ellie Mae, Inc.            Page 2 of 10            FLEDEED 1120
FLEDEED (CLS)
07/14/2021 01:19 PM PST

Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay



to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance

coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such, loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either

to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obliga-tion to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials con-taining asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).



Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____    07/15/2021 (Seal)
**ALEXANDRA FUENTES GALLERES**                              DATE
47 Canyon Island dr
Newport Beach, CA 92660

**Witnesses:**
**Signed, sealed and delivered in the presence of:**

_____

CHRISTOPHER INGRAM
**Printed Name**

_____

Rodney R. Foster

_____
**Printed Name**

State of Florida                                                    County of Collier

The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization, this __15__ day of __July__, __2021__ by ALEXANDRA FUENTES GALLERES, who is/are personally known to me or who has/have produced ___Drivers License___ as identification.

_____
Signature

Rodney R. Foster
_____
Printed Name

**Notary Public**
_____
Title or Rank

_____
Serial Number (if any)

RODNEY R. FOSTER
Notary Public - State of Florida
Commission ≠ HH 034803
My Comm. Expires Sep 25. 2024
Bonded through National Notary Assn.

Lender: SecurityNational Mortgage Company
NMLS ID: 3116
Loan Originator: Colin Patrick Wauchope
NMLS ID: 1101426

## Exhibit A

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF COLLIER, STATE OF FLORIDA, AND IS DESCRIBED AS FOLLOWS:

LOT 97 OF THE PLAT OF ABACO POINTE, RECORDED IN PLAT BOOK 66, PAGE 61-64 IN THE PUBLIC RECORDS OF COLLIER COUNTY, FLORIDA

Parcel ID:21800012125

Commonly known as 14838 Loggerhead Drive, Naples, FL 34120
However, by showing this address no additional coverage is provided



## PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **15th**          day of **July, 2021**                and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **SecurityNational Mortgage Company**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:  **14838 Loggerhead Drive, Naples, FL 34120.**

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **COVENANTS, CONDITIONS AND RESTRICTIONS**

(the "Declaration"). The Property is a part of a planned unit development known as  **Abaco Pointe**

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to ensure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form  3150 1/01
Ellie Mae, Inc.                                    Page 1 of 2                              F3150RDU  0115
                                                                                            F3150RLU (CLS)
                                                                                   07/14/2021 01:19 PM PST

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

ALEXANDRA FUENTES GALLERES       07/15/2021 (Seal)
           DATE

MULTISTATE PUD RIDER--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** Form 3150 1/01
Ellie Mae, Inc.       Page 2 of 2       F3150RDU  0115
F3150RLU (CLS)
07/14/2021 01:19 PM PST

# EXHIBIT "B"

## LOST NOTE AFFIDAVIT

STATE OF __Utah____ )
                                   ) ss.:
COUNTY OF __Salt Lake_____ )

__Mike Brumble_____, being duly sworn, deposes and says:

1. That s/he is a __Vice President____ of ___SecurityNational Mortgage Company_____ (the "Company") and is authorized to make this Affidavit on behalf of the Company;

2. That the address of the Company is _433 Ascension Way, Suite 400, Salt Lake City, UT 84123____;

3. That the Company previously originated or purchased the mortgage note identified below and, after having conducted a diligent investigation in its records and files, the Company has been unable to locate the original note and believes that said original note has either been lost, misfiled, misplaced or destroyed:

    A note in the original principal sum of $_519,840.00__ made by Alexander Fuentes Galleres to _SecurityNational Mortgage Company___, and dated _July 15, 2021_.

4. That the records of the Company do not show that such note was ever released, paid off, satisfied, assigned, transferred, pledged, hypothecated or otherwise disposed of and that such original note has been either lost, mislaid, misfiled or destroyed;

5. Upon discovering that the original mortgage note was potentially lost or misplaced, the Company took the following actions in an attempt to ascertain the whereabouts of the original mortgage note:

    a. The Company reviewed the applicable mortgage file in its possession to determine if the original mortgage note was located therein.

    b. The Company contacted its servicer and requested that it review its servicing file related to determine if the original mortgage note was located therein.

    c. The Company requested that its servicer contact the outside law firm retained to handle any legally-related matter pertaining to the mortgage loan associated with the mortgage note, *if applicable*, so that such outside law firm could review its files to determine if the original mortgage note was located therein.

1 of 3

6. That the Company is aware that ___Brackenridge Mortgage Trust___, its successors, assigns and/or transferees (collectively, the "Owner") rely upon the statements made herein as to such note having been lost, mislaid, misfiled or destroyed and never having been released, paid off, satisfied, assigned, transferred, pledged, hypothecated or otherwise disposed of;

7. Attached hereto is a true and correct copy of said mortgage note as in effect on the date hereof, endorsed by the Company as provided by the Owner;

8. In the event that the Company should ever locate the original note or if the original should even come into the Company's possession, the Company will immediately and without consideration surrender such original to the Owner;

9. The Company hereby agrees that it shall indemnify and hold harmless the Owner, its successors, and assigns, against any loss, liability or damage, including reasonable attorney's fees, resulting from the unavailability of the original note, including but not limited to any loss, liability or damage arising from (i) any false statement contained in this Affidavit, (ii) any assertion or claim of any party that it has already purchased a mortgage loan evidenced by the original note or any interest in such mortgage loan or that it is the holder of such mortgage loan or any interest in such mortgage loan, (iii) any claim of any entity with respect to the existence of terms of a mortgage loan evidenced by the original note, (iv) the issuance of new instrument in lieu of the original note, (v) any claim of ownership by a third party or negotiation or attempted negotiation of the note by a third party; (vi) any claim whether or not based upon or arising from honoring or refusing to honor the original mortgage note when presented by anyone, or (vii) the inability to enforce the note according to its terms or any delay in enforcing the note according to its terms, the inability to receive, or any delay in receiving, any related proceeds (including, without limitation, related insurance proceeds) due to the lack of an original note or any claim of ownership by a third party or negotiation or attempted negotiation of the original note by a third party;

10. This Affidavit is intended to be relied on by the Owner, its successors, and assigns and the Company represents and warrants that it has the authority to perform its obligations under this Affidavit.

IN WITNESS WHEREOF, the undersigned has executed this instrument on behalf of the Company, this __2__ day of __July 2024____.

By:_____

Name:_ Mike Brumble_____

Title:__Vice President_____


STATE OF __Utah_____          )
                                 ) SS.
COUNTY OF _Salt Lake___          )

On the __2__ day of _July__, _2024____ before me, a Notary Public in and for said State, personally appeared _Mike Brumble____ known to me to be __Vice President_____ of __SecurityNational Mortgage Company___, the company that executed the within instrument and also known to me to be the person who executed it on behalf of said company, and acknowledged to me that such company executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand affixed my official seal the day and year first above written.

_____
        Notary Public

My Commission expires _7-30-2025_

```
┌─────────────────────────────────┐
│ (seal)  MARILEI ROUECHE         │
│         NOTARY PUBLIC-STATE OF UTAH │
│         COMMISSION# 718482      │
│         COMM. EXP. 07-30-2025   │
└─────────────────────────────────┘
```

3 of 3

I hereby certify that this is a true and
certified copy of the original document
Certified by_____ FT _____

# NOTE

July 15, 2021
[Date]

Sterling,
[City]

Virginia
[State]

**14838 Loggerhead Drive, Naples, FL 34120**
**[Property Address]**

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.  $519,840.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is   **SecurityNational Mortgage Company.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  **3.625 %.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  **1st**   day of each month beginning on **September 1, 2021.**   I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  **August 1, 2051,**       I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  **5300 South 360 West, Suite 150**
**Murray, UT 84123**

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **$2,370.74.**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  **15**   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  **5.000 %**    of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:
If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11.  DOCUMENTARY TAX**
The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
**ALEXANDRA FUENTES GALLERES**

Lender: **SecurityNational Mortgage Company**
NMLS ID: **3116**
Loan Originator: **Colin Patrick Wauchope**
NMLS ID: **1101426**

[Sign Original Only]

## Allonge to Note

Name:  Alexandra Fuentes Galleres

Note Amount:   $ 519,840

Note Date:  July 15, 2021

Property Address: 14838 Loggerhead Drive, Naples, FL 34120

Pay to the order of:

without recourse

SecurityNational Mortgage Company

_____
Michael F Brumble, VP Risk Management

# EXHIBIT "C"

INSTR 6626385 OR 6425 PG 1364 RECORDED 12/26/2024 12:00 PM PAGES 2
CLERK OF THE CIRCUIT COURT AND COMPTROLLER, COLLIER COUNTY FLORIDA
REC $18.50 INDX $1.00

Prepared By and Return To:

Meridian Asset Services, LLC
140 Fountain Parkway N Suite 100
St. Petersburg, FL 33716
(239) 351-2442

Space above for Recorder's use

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR SECURITYNATIONAL MORTGAGE COMPANY, ITS SUCCESSORS AND ASSIGNS**, whose address is **P.O. BOX 2026, FLINT, MI 48501-2026**, (ASSIGNOR), does hereby grant, assign and transfer to **U.S. BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE BRACKENRIDGE MORTGAGE TRUST**, whose address is **7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251**, (ASSIGNEE), its successors, transferees and assigns forever, all interest, all liens, and any rights due or to become due thereon under that certain mortgage described below.

Date of Mortgage: **7/15/2021**
Original Loan Amount: **$519,840.00**
Executed by (Borrower(s)): **ALEXANDRA FUENTES GALLERES**
Original Mortgagee: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR SECURITYNATIONAL MORTGAGE COMPANY, ITS SUCCESSORS AND ASSIGNS**
Filed of Record: In Book/Liber/Volume **5985**, Page **2066**
Document/Instrument No: **6099623** in the Recording District of **Collier, FL**, Recorded on **7/22/2021**.

Property more commonly described as: **14838 LOGGERHEAD DRIVE, NAPLES, FLORIDA 34120**

MERS PH# 1-888-679-MERS

4799665 SecurityNational_May24 22560334

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: __11/13/24__

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR SECURITYNATIONAL MORTGAGE COMPANY, ITS SUCCESSORS AND ASSIGNS**

By: **MICHAEL MUIRBROOK**
Title: **VICE PRESIDENT**

Witness Name: **STACEY HOLYOAK**

Witness Name: **KRISTI OWENS**

| A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT |
|---|

State of **UTAH**
County of **SALT LAKE**

On __11/13/24__, before me, **MARILEI ROUECHE**, a Notary Public, personally appeared **MICHAEL MUIRBROOK, VICE PRESIDENT** of/for **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR SECURITYNATIONAL MORTGAGE COMPANY, ITS SUCCESSORS AND ASSIGNS**, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of **UTAH** that the foregoing paragraph is true and correct.

I further certify MICHAEL MUIRBROOK, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

(Notary Name): **MARILEI ROUECHE**

My commission expires: **07/30/2025**



MARILEI ROUECHE
NOTARY PUBLIC-STATE OF UTAH
COMMISSION# 718482
COMM. EXP. 07-30-2025

4799665 SecurityNational_May24 22560334

# EXHIBIT "D"

# Collier County Property Appraiser
## Summary

| | |
|---|---|
| **Parcel ID** | 21800012125 |
| **Site Location** | 14838 LOGGERHEAD DR, NAPLES 34120 |

| | | | |
|---|---|---|---|
| **Name / Address** | FUENTES GALLERES, ALEXANDRA | | |
| | 14838 LOGGERHEAD DR | | |
| **City** | NAPLES | **State** FL | **Zip** 34120 |

| | | | |
|---|---|---|---|
| **Legal** | ABACO POINTE LOT 97 | | |
| **Sub./Condo** | 160250 - ABACO POINTE | | |
| **Use Code** | 1 - SINGLE FAMILY RESIDENTIAL | **Millage Area** 103 | **Municipality** UNINCORPORATED |

| Map No. | Strap No. | Section | Township | Range | Acres *Estimated |
|---|---|---|---|---|---|
| 3B35 | 160250 973B35 | 35 | 48 | 26 | 0.11 |

## Latest Sales History
### (Not all Sales are listed due to Confidentiality)

| Date | Book-Page | V/I | Q | Amount |
|---|---|---|---|---|
| 07/13/21 | 5985-2064 | I | Y | $547,300 |
| 08/05/20 | 5804-1810 | V | N | $1,159,800 |

## 2025 Certified Tax Roll
### (Subject to Change)

| Just Values | | Amount |
|---|---|---|
| Land | | $233,046 |
| (+) Improvements | | $269,827 |
| (=) Total Just | | $502,873 |
| **Assessment Reductions** | **Applies To** | |
| (-) Save our Homes | All | $9,227 |
| **Assessed Values** | | |
| (=) Assessed | | $493,646 |
| **Exemptions** | **Applies To** | |
| (-) Homestead | All | $25,000 |
| (-) Additional Homestead | Non-School | $25,722 |
| **Taxable Values** | **Millage Rates** | |
| (=) Non-School Taxable | 6.2568 | $442,924 |
| (=) School Taxable | 4.2490 | $468,646 |
| **Tax Amounts** | | |
| Ad Valorem Taxes | | $4,762.58 |
| (+) Non Ad Valorem Assessments | | $261.91 |
| (=) Total Tax | | $5,024.49 |

**Important:** This is not a tax bill. Do not rely on current taxes to estimate taxes after a change in ownership. A transfer may significantly affect the taxable value due to loss of exemptions, reset of Save Our Homes or the 10% Cap, and/or market changes. Use our Tax Estimator to estimate taxes under new ownership. Values reflect conditions as of January 1st each year and may differ from the actual tax bill due to millage changes or additional non-ad valorem assessments. For the most accurate and up-to-date tax information, please visit the Collier County Tax Collector's Office.